[No. S060145. Aug. 27, 1998.]

YAMAHA CORPORATION OF AMERICA, Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

2

4

COUNSEL

Daniel E. Lungren, Attorney General, Carol H. Rehm, Jr., David S. Chaney and Philip C. Griffin, Deputy Attorneys General, for Defendant and Appellant.

Bewley, Lassleben & Miller, Jeffrey S. Baird, Joseph A. Vinatieri and Kevin P. Duthoy for Plaintiff and Respondent.

Daniel Kostenbauder, Lawrence V. Brookes, Wm. Gregrory Turner and Dean F. Andal as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**BROWN, J.**—For more than 40 years, the State Board of Equalization (Board) has made available for publication as the Business Taxes Law Guide summaries of opinions by its attorneys of the business tax effects of a wide range of transactions. Known as "annotations," the summaries are prompted by actual requests for legal opinions by the Board, its field auditors, and businesses subject to statutes within its jurisdiction. The annotations are

brief statements—often only a sentence or two—purporting to state definitively the tax consequences of specific hypothetical business transactions.[1] More extensive analyses, called "back-ups," are available to those who request them.

## FACTS

The taxpayer here, Yamaha Corporation of America (Yamaha), sells musical instruments nationwide. It purchased a quantity of these outside California without paying tax ("extax"), stored them in its resale inventory in a California warehouse, and eventually gave them away to artists, musical equipment dealers and media representatives as promotional gifts. Delivery was made by shipping the instruments via common carrier, either inside or outside California. Yamaha made similar gifts of brochures and other advertising material. Following an audit, the Board determined Yamaha had used the musical instruments and promotional materials *in* California and was thus subject to the state's use tax, an impost levied as a percentage of the property's purchase price. (See Rev. & Tax. Code, § 6008 et seq.) Yamaha paid the taxes determined by the Board to be due (about $700,000) under protest and then brought this refund suit. Although it did not contest the tax assessed on property given to California residents, Yamaha contended no tax was due on the gifts to *out-of-state* recipients.

The superior court decided Yamaha's out-of-state gifts were excluded from California's use tax, and ordered a refund. That disposition, however, was overturned by the Court of Appeal. Casting the issue as whether Yamaha's promotional gifts had occurred in California or in the state of the donee, the Court of Appeal looked to an annotation in the Business Taxes Law Guide. According to the guide, gifts are subject to California's use tax

---

[1]Two examples, drawn at random, illustrate the annotation form: "Beer Can Openers, furnished by breweries to retailers with beer, are not regarded as 'self consumed' by the breweries. 10/2/50." (2A State Bd. of Equalization, Bus. Taxes Law Guide, Sales & Use Tax Annots. (1998) Annot. No. 280.0160, p. 3731.) "Bookmarks Sold For $2.00 'Postage And Handling'. A taxpayer located in California offers a bookmark to customers for a $2.00 charge, designated as postage and handling. Most of the orders received for the bookmark are from out of state. [¶] Assuming that the charge for the bookmark is 50 percent or more of its cost, the taxpayer is considered to be selling the bookmarks rather than consuming them (Regulation 1670 (b)). Accordingly, when a bookmark is sent to a California customer through the U.S. Mail, the amount of postage shown on the package is considered to be a nontaxable transportation charge. For example, when a bookmark is sent to a California customer, if the postage on the envelope is shown as 25 cents, then the taxable gross receipts from the transfer is $1.75. If the bookmark is mailed to a customer located outside California, the tax does not apply to any of the $2.00 charge. 12/5/88." (*Id.*, Annot. No. 280.0185, pp. 3731-3732.)

"[w]hen the donor divests itself of control over the property in this state."[2] (2A State Bd. of Equalization, Bus. Taxes Law Guide, Sales & Use Tax Annots., *supra*, Annot. No. 280.0040, p. 3731). Adopting that annotation as dispositive, the Court of Appeal reversed the judgment of the superior court and reinstated the Board's tax assessment. We granted Yamaha's petition for review and now reverse the Court of Appeal's judgment and order the matter returned to that court for further proceedings consistent with our opinion.

DISCUSSION

I

The question is what legal effect courts must give to the Board's annotations when they are relied on as supporting its position in taxpayer litigation. In the broader context of administrative law generally, the question is what standard courts apply when reviewing an agency's *interpretation* of a statute. In effect, the Court of Appeal held the annotations were entitled to the same "weight" or "deference" as "quasi-legislative" rules.[3] The Court of Appeal adopted the following formulation: "[A] long-standing and consistent administrative construction of a statute by an administrative agency charged with its enforcement and interpretation is entitled to great weight unless it is either 'arbitrary, capricious or without rational basis' [citations],

---

[2] The annotation on which the Board relied—Annotation No. 280.0040—purports to interpret section 6009.1 of the Revenue and Taxation Code, excluding from the definition of storage and use "keeping, retaining or exercising any right or power over tangible personal property for the purpose of subsequently transporting it outside the state." Captioned "Advertising Material—Gifts," the annotation provides that "Advertising or promotional material shipped or brought into the state and temporarily stored here prior to shipment outside state is subject to use tax when a gift of the material [is] made and title passes to the donee in this state. When the donor divests itself of control over the property in this state the gift is regarded as being a taxable use of the property. 10/11/63." (2A State Bd. of Equalization, Bus. Taxes Law Guide, Sales & Use Tax Annots., *supra*, Annot. No. 280.0040, p. 3731.)

[3] Throughout, we use the terms "quasi-legislative" and "interpretive" in their traditional administrative law senses; i.e., as indicating both the constitutional source of a rule or regulation and the weight or judicial deference due it. (See, e.g., 1 Davis & Pierce, Administrative Law (3d ed. 1994) § 6.3, pp. 233-248.) Of course, administrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature. (See *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 575-576 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; cf. *Tidewater Marine Western, Inc.* v. *Bradshaw* (1996) 14 Cal.4th 557, 574-575 [59 Cal.Rptr.2d 186, 927 P.2d 296] [comparing the two kinds of rules and suggesting that while interpretive rules are not quasi-legislative in the traditional sense, "an agency would arguably still have to adopt these regulations in accordance with [Administrative Procedure Act rulemaking requirements]." The issue is not strictly presented by this case, however: Government Code section 11342, subdivision (g) declares that "[r]egulation" does not include "legal rulings of counsel issued by the . . . State Board of Equalization."].)

or is 'clearly erroneous or unauthorized.' [Citation.] Opinions of the administrative agency's counsel construing the statute," the court went on to say, "are likewise entitled to consideration. [Citations.] Especially where there has been acquiescence by persons having an interest in the matter," the court added, "courts will generally not depart from such an interpretation unless it is unreasonable or clearly erroneous." As this extract from the Court of Appeal opinion indicates, the court relied on a skein of cases as supporting these several, somewhat inconsistent, propositions of administrative law.

We reach a different conclusion. An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to "make law," and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation. ■ Justice Mosk may have provided the best description when he wrote in *Western States Petroleum Assn.* v. *Superior Court, supra,* 9 Cal.4th 559, that " 'The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Id.* at pp. 575-576; see also *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935] [An "administrative interpretation . . . will be accorded great respect by the courts and will be followed if not clearly erroneous. [Citations.] But such a tentative . . . interpretation makes no pretense at finality and it is the duty of this court . . . to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction. [Citations.] The ultimate interpretation of a statute is an exercise of the judicial power . . . conferred upon the courts by the Constitution and, in the absence of a constitutional provision, cannot be exercised by any other body."].)

■ Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending

on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. (See *Traverso* v. *People* ex rel. *Dept. of Transportation* (1996) 46 Cal.App.4th 1197, 1206 [54 Cal.Rptr.2d 434].) Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, "The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action." (Judicial Review of Agency Action (Feb. 1997) 27 Cal. Law Revision Com. Rep. (1997) p. 81, italics added.)

## II

Here, the Court of Appeal relied on language from its prior cases suggesting broadly that an agency interpretation of a statute carries the *same* weight—that is, is reviewed under the same standard—as a quasi-legislative regulation. Unlike the annotations here, however, quasi-legislative rules are the substantive product of a delegated *legislative* power conferred on the agency. The formulation on which the Court of Appeal relied is thus apt to lead a court (as it led here) to abdicate a quintessential judicial duty— applying its independent judgment de novo to the merits of the *legal* issue before it. The fact that in this case the Court of Appeal determined Yamaha's tax liability by giving the Board's annotation a weight amounting to unquestioning acceptance only compounded the error.

We derive these conclusions from long-standing administrative law decisions of this court. Although the web making up that jurisprudence is not seamless, on the whole it is both logical and coherent. In *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593] (*Culligan*), the taxpayer sued for a refund of sales and use taxes paid under protest on ion-exchange equipment used to condition water and leased to residential subscribers: Because it came from a service business rather than the rental of property, the taxpayer contended, the income was not subject to the Sales and Use Tax Law. In refund litigation, the Board relied on an affidavit of its assistant chief counsel characterizing the transactions as leases taxable under the Sales and Use Tax Law. The trial court rejected the Board's position, calling it an unwarranted extension of the words of the statute, and awarded judgment to the taxpayer. (17 Cal.3d at p. 92.)

Justice Sullivan began his opinion for a unanimous court by asking what was "the appropriate standard of review applicable to the [use tax] assessment against" the taxpayer. (*Culligan, supra,* 17 Cal.3d at p. 92.) The Board

contended its assessment was based on an "administrative classification" and could be judicially overturned only if it was "arbitrary, capricious or without rational basis." (*Ibid.*) Our opinion pointed out, however, that the basis for the Board's tax assessment "was not embodied in any formal regulation or even interpretative ruling covering the water conditioning industry as a whole." (*Ibid.*) Instead, its basis "was nothing more than the Board auditor's interpretation of two existing regulations." (*Ibid.*) "If the Board had promulgated a formal regulation determining the proper classification of receipts derived from the rental of exchange units . . . and the regulation had been challenged in the [refund] action," our *Culligan* opinion went on to say, "the proper scope of reviewing such regulation *would* be one of limited judicial review as urged by the Board. [Citations.]" (*Ibid.*, italics added.)

That was not the case in *Culligan*, however. Instead of adopting a formal regulation, the Board and its staff had considered the facts of the taxpayer's particular transactions, interpreted the statutes and regulations they deemed applicable, and "arrived at certain conclusions as to plaintiff's tax liability and assessed the tax accordingly." (17 Cal.3d at p. 92.) Far from being "the equivalent of a regulation or ruling of general application," the Board's argument was "merely its litigating position in this particular matter." (*Id.* at p. 93.) In an important footnote to its opinion, the *Culligan* court disapproved language in several Court of Appeal decisions "indicating that the proper scope of review of such litigating positions of the Board (announced either in tax bulletins or merely as the result of an individual audit) is to determine whether the Board's assessment was arbitrary, capricious or had no reasonable or rational basis." (*Id.* at p. 93, fn. 4.)

Although the Court of Appeal in this case cited *Culligan, supra,* 17 Cal.3d 86, it regarded *American Hospital Supply Corp.* v. *State Bd. of Equalization* (1985) 169 Cal.App.3d 1088 [215 Cal.Rptr. 744] (*American Hospital*) as the decisive precedent. The question there was whether disposable paper menus, used for patients' meals in hospitals, were subject to the sales tax. In concluding they were, the Court of Appeal relied on a ruling of Board counsel interpreting a quasi-legislative regulation of the Board. "Interpretation of an administrative regulation," the court wrote, "like [the] interpretation of a statute, is a question of law which rests with the courts. However, the agency's own interpretation of its regulation is entitled to great weight." (*Id.* at p. 1092.) The Board's interpretation could be overturned, the opinion went on to state, only if it was " 'arbitrary, capricious or without rational basis.' " (*Ibid.*)

The *American Hospital* opinion also rejected the taxpayer's contention that because the rule at issue was only an interpretation and not a quasi-legislative rule, it was not entitled to deference. (*American Hospital, supra,*

169 Cal.App.3d at p. 1092.) Instead, the court read *Culligan* as standing for the *opposite* proposition. Because we had said the rule at issue there did not cover an entire industry, the Court of Appeal reasoned *Culligan* had held in effect that it was nothing more than a " 'litigating position' " and could be ignored. (169 Cal.App.3d at p. 1093.) On that basis, *American Hospital* concluded that because the Board's position on the taxability of paper menus *was* embodied in a "formal regulation" *and* covered the entire hospital industry, it was entitled to the same deference as a quasi-legislative rule: "[It] must prevail because it is neither 'arbitrary, capricious or without rational basis' (*Culligan Water Conditioning* v. *State Bd. of Equalization*, *supra*, 17 Cal.3d 86, 92) nor is it 'clearly erroneous or unauthorized' (*Rivera* v. *City of Fresno* [(1971)] 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793])." (*Ibid.*)

We think the Court of Appeal in *American Hospital, supra,* 169 Cal.App.3d 1088, and the Court of Appeal in this case by relying on it, failed to distinguish between two classes of rules—quasi-legislative and interpretive—that, because of their differing legal sources, command significantly different degrees of deference by the courts. Moreover, *American Hospital* misread our opinion in *Culligan* when it identified the feature that distinguishes one kind of rule from the other. Although the Court of Appeal here did not rely on other prior cases as much as on *American Hospital*, it cited several that appear to perpetuate the same confusion. (See *Rizzo* v. *Board of Trustees* (1994) 27 Cal.App.4th 853, 861 [32 Cal.Rptr.2d 892]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722]; *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793].)

 It is a "black letter" proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. (See, e.g., 1 Davis & Pierce, Administrative Law, *supra*, § 6.3, at pp. 233-248; 1 Cooper, State Administrative Law (1965) Rule Making: Procedures, pp. 173-176; Bonfield, State Administrative Rulemaking (1986) Interpretive Rules, § 6.9.1, pp. 279-283; 9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, § 116, p. 1160 [collecting cases].) Because agencies granted such substantive rulemaking power are truly "making law," their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it

is reasonably necessary to implement the purpose of the statute, judicial review is at an end.

We summarized this characteristic of quasi-legislative rules in *Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60, 65 [219 Cal.Rptr. 142, 707 P.2d 204] (*Wallace Berrie*): " '[I]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is "within the scope of the authority conferred" [citation] and (2) is "reasonably necessary to effectuate the purpose of the statute" [citation].' [Citation.] 'These issues do not present a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with [a] strong presumption of regularity . . . .' [Citation.] Our inquiry necessarily is confined to the question whether the classification is 'arbitrary, capricious or [without] reasonable or rational basis.' (*Culligan, supra,* 17 Cal.3d at p. 93, fn. 4 [citations].)"[4]

It is the other class of administrative rules, those *interpreting* a statute, that is at issue in this case. Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this "expertise," expressed as an interpretation (whether in a regulation or less formally, as in the case of the Board's tax annotations), that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion,* however "expert," rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference. (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d at pp. 325-326.)

In *International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923 [163 Cal.Rptr. 782, 609 P.2d 1], we contrasted the narrow

[4]In one respect, our opinion in *Wallace Berrie* may overstate the level of deference—even quasi-legislative rules are reviewed independently for consistency with controlling law. A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has "final responsibility for the interpretation of the law" under which the regulation was issued. (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405]; see cases cited, *post,* at pp. 11-12; *Environmental Protection Information Center* v. *Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1022 [50 Cal.Rptr.2d 892] [Standard of review of challenges to "fundamental legitimacy" of quasi-legislative regulation is " 'respectful nondeference.' "].)

standard under which quasi-legislative rules are reviewed—"limited," we wrote, "to a determination whether the agency's action is arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law" (*id.* at p. 931, fn. 7)—with the broader standard courts apply to interpretations. The quasi-legislative standard of review "is *inapplicable* when the agency is not exercising a discretionary rule-making power, but merely *construing* a controlling statute. The appropriate mode of review in such a case is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]" (*Ibid.*, italics added; see also *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2] ["courts are the ultimate arbiters of the construction of a statute"]; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323] ["The final meaning of a statute . . . rests with the courts."]; *Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697] [" 'final responsibility for the interpretation of the law rests with the courts' "].)

██ Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the "weight" it should be given—is thus fundamentally *situational.* A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command. Professor Michael Asimow, an administrative law adviser to the California Law Revision Commission, has identified two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation: Those "indicating that the agency has a comparative interpretive advantage over the courts," and those "indicating that the interpretation in question is probably correct." (Cal. Law Revision Com., Tent. Recommendation, Judicial Review of Agency Action (Aug. 1995) p. 11 (Tentative Recommendation); see also Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1192-1209.)

In the first category are factors that "assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another." (Tentative Recommendation, *supra*, at p. 11.) The second group of

factors in the Asimow classification—those suggesting the agency's interpretation is likely to be correct—includes indications of careful consideration by senior agency officials ("an interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member" (Tentative Recommendation, *supra*, at p. 11)), evidence that the agency "has consistently maintained the interpretation in question, especially if [it] is long-standing" (*ibid.*) ("[a] vacillating position . . . is entitled to no deference" (*ibid.*)), and indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted. If an agency has adopted an interpretive rule in accordance with Administrative Procedure Act provisions—which include procedures (e.g., notice to the public of the proposed rule and opportunity for public comment) that enhance the accuracy and reliability of the resulting administrative "product"—that circumstance weighs in favor of judicial deference. However, even formal interpretive rules do not command the same weight as quasi-legislative rules. Because " 'the ultimate resolution of . . . legal questions rests with the courts' " (*Culligan, supra,* 17 Cal.3d at p. 93), judges play a greater role when reviewing the persuasive value of interpretive rules than they do in determining the validity of quasi-legislative rules.

A valuable judicial account of the process by which courts reckon the weight of agency interpretations was provided by Justice Robert Jackson's opinion in *Skidmore* v. *Swift & Co.* (1944) 323 U.S. 134 [65 S.Ct. 161, 89 L.Ed. 124] (*Skidmore*), a case arising under the federal Fair Labor Standards Act. The question for the court was whether private firefighters' "waiting time" was countable as "working time" under the act and thus compensable. (323 U.S. at p. 136 [65 S.Ct. at p. 163].) "Congress," the *Skidmore* opinion observed, "did not utilize the services of an administrative agency to find facts and to determine in the first instance whether particular cases fall within or without the Act." (*Id.* at p. 137 [65 S.Ct. at p. 163].) "Instead, it put this responsibility on the courts. [Citation.] But it did create the office of Administrator, impose upon him a variety of duties, endow him with powers to inform himself of conditions in industries and employments subject to the Act, and put on him the duties of bringing injunction actions to restrain violations. Pursuit of his duties has accumulated a considerable experience in the problems of ascertaining [the issue in suit] and a knowledge of the customs prevailing in reference to their solution. . . . He has set forth his views of the application of the Act under different circumstances in an interpretative bulletin and in informal rulings. They provide a practical guide to employers and employees as to how the office representing the public interest in its enforcement will seek to apply it. [Citation.]" (*Id.* at pp. 137-138 [65 S.Ct. at p. 163].)

No statute prescribed the deference federal courts should give the administrator's interpretive bulletins and informal rulings, and they were "not reached as a result of . . . adversary proceedings." (*Skidmore, supra,* 323 U.S. at p. 139 [65 S.Ct. at p. 164].) Given those features, Justice Jackson concluded, the administrator's rulings "do not constitute an interpretation of the Act or a standard for judging factual situations which *binds* a . . . court's processes, as an authoritative pronouncement of a higher court might do." (*Ibid.,* italics added.) Still, the court held, the fact that "the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect." (*Id.* at p. 140 [65 S.Ct. at p. 164].) "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (*Ibid.*)

█ The parallels between the statutory powers and administrative practice of the Board in interpreting the Sales and Use Tax Law, and those of the federal agency described in *Skidmore,* are extensive. As with Congress, our Legislature has not conferred adjudicatory powers on the Board as the means by which sales and use tax liabilities are determined; instead, the validity of those assessments is settled in tax refund litigation like this case. (Rev. & Tax. Code, § 6933.) Like the federal administrator in *Skidmore,* the Board has not adopted a formal regulation under its quasi-legislative rulemaking powers purporting to interpret the statute at issue here. As in *Skidmore,* however, the Board and its staff have accumulated a substantial "body of experience and informed judgment" in the administration of the business tax law "to which the courts and litigants may properly resort for guidance." (323 U.S. at p. 140 [65 S.Ct. at p. 164].) Some of that experience and informed judgment takes the form of the annotations published in the Business Taxes Law Guide.

The opinion in the *Skidmore* case and Professor Asimow's account for the Law Revision Commission—together spanning a half-century of judicial and scholarly comment on the characteristics and role of administrative interpretations—accurately describe their value and the criteria by which courts judge their weight. The deference due an agency interpretation—including the Board's annotations at issue here—turns on a legally informed, common-sense assessment of their contextual merit. "The weight of such a judgment in a particular case," to borrow again from Justice Jackson's opinion in *Skidmore,* "will depend upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power*

*to control.*" (*Skidmore, supra,* 323 U.S. at p. 140 [65 S.Ct. at p. 164], italics added.)

As we read the brief filed by the Attorney General, the Board does not contend for any greater judicial weight for its annotations. Its brief on the merits states that "Yamaha is correct that the annotations are not regulations, and they are not binding upon taxpayers, the Board itself, or the Court. Nevertheless, the annotations are digests of opinions written by the legal staff of the Board which are evidentiary of administrative interpretations made by the Board in the normal course of its administration of the Sales and Use Tax Law . . . . [T]he annotations have substantial precedential effect within the agency. [¶] The interpretation represented in [the] annotations is certainly entitled to some consideration by the Court."

We agree.

## CONCLUSION

In deciding this case, the Court of Appeal gave greater weight to the Board's annotation than it warranted. Although the standard used by the Court of Appeal was not the correct one and prejudiced the taxpayer, regard for the structure of appellate decisionmaking suggests the case should be returned to the Court of Appeal. That court can then consider the merits of the use tax issue and the value of the Board's interpretation in light of the conclusions drawn here. To the extent language in *Rizzo* v. *Board of Trustees, supra,* 27 Cal.App.4th at page 861, *DeYoung* v. *City of San Diego, supra,* 147 Cal.App.3d at page 18, and *Rivera* v. *City of Fresno, supra,* 6 Cal.3d at page 140, is inconsistent with the foregoing views, it is disapproved. We express no opinion on the merits of the underlying question of Yamaha's use tax liability.

## DISPOSITION

The judgment of the Court of Appeal is reversed and the cause is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the judgment of the majority that the Court of Appeal's formulation of the standard of review for tax annotations, the summaries of tax opinions of the State Board of Equalization's (Board) legal counsel published in the Business Taxes Law Guide, was not quite correct. Specifically the Court of Appeal erred in suggesting that it would defer to

the Board's or its legal counsel's rule unless that rule is "arbitrary and capricious." The majority do not purport to change the well-established, if not always consistently articulated, body of law pertaining to judicial review of administrative rulings, but merely attempt to clarify that law. I write separately to further clarify the relevant legal principles and their application to the present case.

The appropriate starting point of a discussion of judicial review of administrative regulations is an analysis of quasi-legislative regulations, those regulations formally adopted by an agency pursuant to the California Administrative Procedures Act (APA) and binding on the agency. "The proper scope of a court's review is determined by the *task* before it." (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032], italics added.) In the case of quasi-legislative regulations, the court has essentially two tasks. The first duty is "to determine whether the [agency] exercised [its] quasi-legislative authority within the bounds of the statutory mandate." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697] (*Morris*).) As the *Morris* court made clear, this is a matter for the independent judgment of the court. "While the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to *great weight*, nevertheless 'Whatever the force of administrative construction . . . *final responsibility for the interpretation of the law rests with the courts*.' [Citation.] Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. [Citations.]" (*Ibid.*, italics added.) This duty derives directly from statute. "Under Government Code[1] section 11373 [now § 11342.1], '[e]ach regulation adopted [by a state agency], to be effective, must be within the scope of authority conferred. . . .' Whenever a state agency is authorized by statute 'to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, *no regulation adopted is valid or effective unless consistent and not in conflict with the statute. . . .*' . . . ([§ 11342.2].)" (*Morris, supra,* 67 Cal.2d at p. 748, fn. omitted, italics added by *Morris* court.)

The court's second task arises once it has completed the first. "If we conclude that the [agency] was empowered to adopt the regulations, we must also determine whether the regulations are 'reasonably necessary to effectuate the purpose of the statute.' [(§ 11342.2).] In making such a determination, the court will not 'superimpose its own policy judgment upon the

---

[1] All further statutory references are to the Government Code unless otherwise stated.

agency in the absence of an arbitrary and capricious decision.' [Citations.]" (*Morris, supra*, 67 Cal.2d at pp. 748-749.)

In *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2] (*Rank*) we further clarified the two tasks and two distinct standards of review for courts scrutinizing agency regulations. We stated: "As we said in *Pitts* v. *Perluss* (1962) 58 Cal.2d 824[, 833] [27 Cal.Rptr. 19, 377 P.2d 83], '[a]s to quasi-legislative acts of administrative agencies, "judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law." ' [Citations.] When, however, a regulation is challenged as inconsistent with the terms or intent of the authorizing statute, the standard of review is different, because the courts are the ultimate arbiters of the construction of a statute. Thus, [the *Morris* court] in finding that the challenged regulations contravened legislative intent, rejected the agency's claim that the only issue for review was whether the regulations were arbitrary and capricious." (*Ibid.*, fn. omitted.) The *Rank* court then proceeded to reiterate the *Morris* formulation that " '[w]hile the construction of a statute by officials charged with its administration . . . is entitled to great weight, . . . final responsibility for the interpretation of the law rests with the courts.' " (*Ibid.*)[2] (We will henceforth refer to this standard as the "independent judgment/great weight standard.")

There is an important qualification to the independent judgment/great weight standard articulated above, when a court finds that the Legislature has *delegated* the task of interpreting or elaborating on a statute to an administrative agency. A court may find that the Legislature has intended to delegate this interpretive or gap-filling power when it employs open-ended statutory language that an agency is authorized to apply or "when an issue of interpretation is heavily freighted with policy choices which the agency is empowered to make." (Asimow, *The Scope of Judicial Review of Decisions of*

---

[2]Certain of our own cases have confused the standards of review in this two-pronged test. For example, in *Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60, 65 [219 Cal.Rptr. 142, 707 P.2d 204], after stating the above two-pronged test, declared that neither prong " 'present[s] a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with [a] strong presumption of regularity . . . .' [Citation.] Our inquiry necessarily is confined to the question whether the classification is 'arbitrary, capricious or [without] reasonable or rational basis.' [Citation.]" As the discussion of *Rank* and *Morris* above makes clear, the first prong of the inquiry—whether the regulation is "within the scope of the authority conferred"—is *not* limited to the "arbitrary and capricious" standard of review, but employs the independent judgment/great weight standard. (*Rank, supra*, 51 Cal.3d at p. 11; *Morris, supra*, 67 Cal.2d at pp. 748-749.) This confusion is in part responsible for the misstatements of the Court of Appeal in the present case.

*California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1198-1199 (Asimow).) For example, in *Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999 [9 Cal.Rptr.2d 358, 831 P.2d 798] (*Moore*), we reviewed a regulation by the Board of Accountancy, the agency statutorily chartered to regulate the accounting profession in this state. The regulation provided that those unlicensed by that board could not use the title "accountant," interpreting a statute, Business and Professions Code section 5058, that forbids use of titles "likely to be confused with" the titles of "certified public accountant" and "public accountant." (2 Cal.4th at p. 1011.) As we stated, "the Legislature delegated to the Board the authority to determine whether a title or designation not identified in the statute is likely to confuse or mislead the public." (*Id.* at pp. 1013-1014.)

Thus, the agency's interpretation of a statute may be subject to the most deferential "arbitrary and capricious" standard of review when the agency is expressly or impliedly delegated interpretive authority. Such delegation may often be implied when there are broadly worded statutes combined with an authorization of agency rulemaking power. But when the agency is called upon to enforce a detailed statutory scheme, discretion is as a rule correspondingly narrower. In other words, a court must always make an independent determination whether the agency regulation is "within the scope of the authority conferred," and that determination includes an inquiry into the extent to which the Legislature intended to delegate discretion to the agency to construe or elaborate on the authorizing statute.

The above schema applies to so-called "interpretive" regulations as well as quasi-legislative regulations. As the majority observe, "administrative rules do not always fall neatly into one category or the other . . . ." (Maj. opn., *ante*, at p. 6, fn. 3.) Indeed, regulations subject to the formal procedural requirements of the APA include those that "interpret" the law enforced or administered by a government agency, as well as those that "implement" or "make specific" such law. (§ 11342, subd. (b).) As we recently stated: "A written statement of policy that an agency intends to apply generally, that is unrelated to a specific case, and that predicts how the agency will decide future cases is essentially *legislative* in nature even if it merely *interprets* applicable law." (*Tidewater Marine Western, Inc.* v. *Bradshaw* (1996) 14 Cal.4th 557, 574-575 [59 Cal.Rptr.2d 186, 927 P.2d 296], italics added.)[3] Moreover, all regulations are "interpretive" to some extent, because all

---

[3]I note that in federal law, by contrast, the term "interpretive rule" is given a particular significance and legal status. According to statute, "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency" are required to be published in the Federal Register. (5 U.S.C. § 552(a)(1)(D).) But such "interpretive rules," and "general

regulations implicitly or explicitly interpret "the authority invested in them to implement and carry out [statutory] provisions . . . ." (*Morris, supra,* 67 Cal.2d at p. 748.)

Of course, some regulations may be properly designated "interpretive" inasmuch as they have no purpose other than to interpret statutes. (See, e.g., *International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923 [163 Cal.Rptr. 782, 609 P.2d 1].) In the case of such regulations, courts will be engaged only in the first of the two tasks discussed above, i.e., ensuring that the regulation is within the scope of the statutory authority conferred, employing the independent judgment/great weight test. (See *id.* at p. 931, fn. 7.)

In sum, when reviewing a quasi-legislative regulation, courts consider whether the regulation is within the scope of the authority conferred, essentially a question of the validity of an agency's statutory interpretation, guided by the independent judgment/great weight standard. (*Rank, supra,* 51 Cal.3d at p. 11.) This is in contrast to the second aspect of the inquiry, whether a regulation is "reasonably necessary to effectuate the statutory purpose," wherein courts "will not intervene in the absence of an arbitrary or capricious decision." (*Ibid.,* citing *Morris, supra,* 67 Cal.2d at p. 749.) Courts may also employ the "arbitrary and capricious" standard in reviewing whether the agency's construction of a statute is correct if the court determines that the particular statutory scheme in question explicitly or implicitly delegates this interpretive or "gap-filling" authority to an administrative agency. (See *Moore, supra,* 2 Cal.4th at pp. 1013-1014; Asimow, *supra,* 42 UCLA L.Rev. at p. 1198.)

What standard of review should be employed for administrative rulings that were not formally adopted under the APA? Such regulations fall generally into two categories. The first is the class of regulations that *should* have been formally adopted under the APA, but were not. In such cases, the law is clear that in order to effectuate the policies behind the APA courts are to give *no* weight to these interpretive regulations. (*Tidewater Marine Western, Inc.* v. *Bradshaw, supra,* 14 Cal.4th at p. 576; *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 204-205 [149 Cal.Rptr. 1, 583 P.2d 744].) To hold otherwise would help to perpetuate the problem of avoidance by administrative agencies of " 'the mandatory requirements of the [APA] of public notice, opportunity to be heard by the public, filing with the Secretary of State, and publication in the [California Code of Regulations].' "

statements of policy" are explicitly exempt from the notice and hearing provisions of the federal APA. (5 U.S.C. § 553(b)(3)(A).) No such distinction exists in California law.

(*Armistead, supra*, 22 Cal.3d at p. 205.) For these reasons, and quite apart from any expertise the agency may possess in interpreting and administering the statute, courts in effect ignore the agency's illegal regulation.

In the second category are those regulations that are not subject to the APA because they are expressly or implicitly exempted from or outside the scope of APA requirements. For such rulings, the standard of judicial review of agency interpretations of statutes is basically the same as for those rules adopted under the APA, i.e., the independent judgment/great weight standard. (See, e.g., *Wilkinson* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848] [applying essentially this standard to a statutory interpretation arising within the context of the Workers' Compensation Appeals Board's decisional law]; see also Asimow, *supra*, 42 UCLA L.Rev. at pp. 1200-1201; Judicial Review of Agency Action (Feb. 1997) 27 Cal. Law Revision Com. Rep. (1997) pp. 81-82 (Judicial Review of Agency Action).).

The Board counsel's legal ruling at issue in this case is an example of express exemption from the APA. Section 11342, subdivision (g), specifies that the term "regulation" for purposes of the APA does not include "legal rulings of counsel issued by the Franchise Tax Board or State Board of Equalization . . . ." It is therefore evident that our decisions pertaining to regulations that fail to be approved according to required APA procedures are inapposite. It also appears evident that these rulings, as agency interpretations of statutory law, are also to be reviewed under the independent judgment/great weight standard.

But, as the majority point out, the precise weight to be accorded an agency interpretation varies depending on a number of factors. Professor Asimow states that deference is especially appropriate not only when an administrative agency has particular expertise, but also by virtue of its specialization in administering a statute, which "gives [that agency] an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations." (Asimow, *supra*, 42 UCLA L.Rev. at p. 1196.) Moreover, deference is more appropriate when, as in the present case, the agency is interpreting "the statute [it] enforces" rather than "some other statute, the common law, the [C]onstitution, or prior judicial precedents." (*Ibid.*)

Another important factor, as the majority recognize, is whether an administrative construction is consistent and of long standing. (Maj. opn., *ante*, at p. 13.) This factor is particularly important for resolution of the present case because the tax annotation with which the case is principally concerned,

Business Taxes Law Guide Annotation No. 280.0040, was first published in 1963, and Yamaha Corporation of America does not contest that it has represented the Board's position on the tax question at issue at least since that time. (See now 2A State Bd. of Equalization, Bus. Taxes Law Guide, Sales & Use Tax Annots. (1998) Annot. No. 280.0040, p. 3731 (hereafter Annotation No. 280.0040).)

As the Court of Appeal has stated: "Long-standing, consistent administrative construction of a statute by those charged with its administration, particularly where interested parties have acquiesced in the interpretation, is entitled to great weight and should not be disturbed unless clearly erroneous." (*Rizzo* v. *Board of Trustees* (1994) 27 Cal.App.4th 853, 861 [32 Cal.Rptr.2d 892]. This principle has been affirmed on numerous occasions by this court and the Courts of Appeal. (See, e.g., *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722]; *Nelson* v. *Dean* (1946) 27 Cal.2d 873, 880-881 [168 P.2d 16, 168 A.L.R. 467]; *Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405]; *Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1256-1257 [6 Cal.Rptr.2d 375]; *Lute* v. *Governing Board* (1988) 202 Cal.App.3d 1177, 1183 [249 Cal.Rptr. 161]; *Napa Valley Educators' Assn.* v. *Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 252 [239 Cal.Rptr. 395]; *Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 382 [116 Cal.Rptr. 113].) Moreover, this principle applies to administrative practices embodied in staff attorney opinions and other expressions short of formal, quasi-legislative regulations. (See, e.g., *DeYoung, supra,* 147 Cal.App.3d 11, 19-21 [longstanding interpretation of city charter provision embodied in city attorney's opinions]; *Napa Valley Educators' Assn., supra,* 194 Cal.App.3d at pp. 251-252 [evidence in the record of the case, including a declaration by official with the State Department of Education, shows long-standing practice of following a certain interpretation of an Education Code provision].)

Two reasons have been advanced for this principle. First, "When an administrative interpretation is of long standing and has remained uniform, it is likely that numerous transactions have been entered into in reliance thereon, and it could be invalidated only at the cost of major readjustments and extensive litigation." (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com., supra,* 24 Cal.2d at p. 757; see also *Nelson* v. *Dean, supra,* 27 Cal.2d at p. 881; *Rizzo* v. *Board of Trustees, supra,* 27 Cal.App.4th at p. 862.)

Second, as we stated in *Moore, supra,* 2 Cal.4th at pages 1017-1018, "a presumption that the Legislature is aware of an administrative construction of a statute should be applied if the agency's interpretation of the statutory provisions is of such longstanding duration that the Legislature may be

presumed to know of it." As the Court of Appeal has further articulated: " '[L]awmakers are presumed to be aware of long-standing administrative practice and, thus, the reenactment of a provision, or the failure to substantially modify a provision, is a strong indication [that] the administrative practice was consistent with underlying legislative intent.' " (*Rizzo* v. *Board of Trustees, supra,* 27 Cal.App.4th at p. 862; see also *Thornton* v. *Carlson, supra,* 4 Cal.App.4th at p. 1257; *Lute* v. *Governing Board, supra,* 202 Cal.App.3d at p. 1183; *Napa Valley Educators' Assn.* v. *Napa Valley Unified School Dist., supra,* 194 Cal.App.3d at 252; *Horn* v. *Swoap, supra,* 41 Cal.App.3d at p. 382.) I note that in the present case, the statute under consideration, Revenue and Taxation Code section 6009.1, has been amended twice since the issuance of Annotation No. 280.0040. (Stats. 1965, ch. 1188, § 1, p. 3004; Stats. 1980, ch. 546, § 1, p. 1503.)

To state the matter in other terms, courts often recognize the propriety of assigning great weight to administrative interpretations of law either by reference to an explicit or implicit delegation of power by the Legislature to an administrative agency (see *Moore, supra,* 2 Cal.4th at pp. 1013-1014; Asimow, *supra,* 42 UCLA L.Rev. at pp. 1198-1199), or by noting the agency's specialization and expertise in interpreting the statutes it is charged with administering (see *Physicians & Surgeons Laboratories, Inc.* v. *Department of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565]; Asimow, *supra,* 42 UCLA L.Rev. at pp. 1195-1196). But there is a third reason for paying special heed to an administrative interpretation: the reality that the administrative agency—by virtue of the necessity of performing its administrative functions—creates a body of de facto law in the interstices of statutory law, which is relied on by the business community and the general public to order their affairs and, after a sufficient passage of time, is presumptively accepted by the Legislature. In the present case, this third rationale for according great weight to an administrative interpretation is particularly applicable. Thus, judicial deference in this case is owed not so much to the tax annotation per se but to a long-standing practice of enforcement and interpretation by Board staff of which the annotation is evidence.

There are also particularly sound reasons why the principle of giving especially greater weight to long-standing administrative practice should apply when, as in this case, that practice is embodied in a published ruling of the Board's legal counsel. These rulings have a special legal status. As noted, they have been specifically exempted from the APA by section 11342, subdivision (g). The purpose of this exemption was stated by the Franchise Tax Board staff in its enrolled bill report to the Governor immediately prior the enactment of the 1983 amendment containing the exemption, and its statement could be equally well applied to the Board of

Equalization. "Department counsel issues a large number of legal rulings in several forms which address specific problems of taxpayers. While these opinions address specific problems, *they are intended to have general application to all taxpayers similarly situated.* This bill provides that such rulings are not regulations, and accordingly, not subject to the [Office of Administrative Law (OAL)] review process. This statutory determination will permit the department to continue to provide a valuable service to taxpayers. If rulings were deemed to be regulations, the service would have to be discontinued because of the administrative burdens created by the OAL review process." (Franchise Tax Bd. staff, Enrolled Bill Rep., Assem. Bill No. 227 (1983-1984 Reg. Sess.) Sept. 16, 1983, p. 3, italics added.)

Thus, the passage of the 1983 amendment to section 11342 was evidently designed for the benefit of taxpayers, so that they would continue to have information about the effective legal positions of the two tax boards. The complexity of tax law and its application to the manifold factual situations of individual taxpayers appears to far outpace an agency's capacity to promulgate and amend formal regulations. Given the importance of certainty in tax law, the Board has long engaged in the practice of issuing legal opinions to individual taxpayers. (See 1 Cal. Taxes (Cont.Ed.Bar Supp. 1996) § 2.152, p. 347.) The Legislature recognized such practice, and recognized the propriety of taxpayer reliance on such rulings, in Revenue and Tax Code section 6596. That section provides that if a person's failure to make a timely payment or return "is due to the person's reasonable reliance on written advice from the [B]oard," that person would be relieved of certain payment obligations. The authorization in section 11342 to publish such individual rulings without following APA requirements is a further legislative means of facilitating business planning and increasing taxpayer certainty about tax law. Publication of this information allows taxpayers subject to the sales and use tax to structure their affairs accordingly, and, if they perceive the need, lobby the Board or the Legislature to overturn these legal rulings. As the Attorney General states in his brief, such rulings, while not binding on the agency, "have substantial precedential effect within the agency." There is accordingly no reason to decline to extend to such legal rulings, insofar as they embody the Board's long-standing interpretations of the sales and use tax statutes, the especially great weight accorded to other representations of long-standing administrative practice.[4]

Tax annotations representing the Board's long-standing position may usefully be contrasted to positions the Board might adopt in the context of

---

[4]Yamaha and amicus curiae claim that tax annotations are frequently inconsistent, and that the Board legal staff has been lax in purging the Business Taxes Law Guide of outdated annotations. Obviously, to the extent that an old annotation does *not* represent the Board's long-standing, *consistent*, interpretation, it does not merit the same consideration. (See *Hudgins* v. *Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1125 [41 Cal.Rptr.2d

litigation. In *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593], we found that such litigating positions were not entitled to as great a level of deference as administrative rulings that were "embodied in formal regulation[s] or even interpretive ruling[s] covering the . . . industry as a whole . . . ." (*Id.* at p. 92).[5] The tax annotation at issue in this case, although originally addressing an individual taxpayer's query, was published and has represented the Board's categorical position regarding taxation of gifts originating from a California source. The annotation, therefore, being both an interpretive ruling of a general nature, and one of long standing, is deserving of significantly greater weight than if the Board had adopted its position only as part of the present litigation.[6]

It may be argued that regulations formally adopted in compliance with the APA should intrinsically be assigned greater weight than tax annotations, because the former are promulgated only after a notice and comment period, whereas the latter are devised by the Board's legal staff without public input.

46].) In the present case, Yamaha does not contend that Annotation No. 280.0040 is inconsistent with other annotations, or with the Board's actual practice, since it was issued.

[5]I note that some of the *Culligan* court's language may be open to misinterpretation. The Board in that case contended that the proper standard of review was whether its position was "arbitrary, capricious or without rational basis." (17 Cal.3d at p. 92.) The court disagreed, holding that " '[t]he interpretation of a regulation, like the interpretation of the statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such legal questions rests with courts.' " (*Id.* at p. 93.) In expressing its disagreement with the proposition that the Board's litigating position deserves the highest level of deference, the *Culligan* court differentiated such positions from "formal regulation" of a general nature, which, the court agreed, would be overturned only if arbitrary and capricious. (*Id.* at p. 92.) Perhaps because the *Culligan* court was focused on making a distinction between regulations of a general nature and litigating positions, it did not articulate the two-pronged judicial inquiry into the validity of quasi-legislative regulations as discussed above, nor did it specify that the arbitrary and capricious standard applied only to the *second* prong. Nonetheless, the *Culligan* court was correct in holding that statutory interpretations contained in formal regulations merit more deference, all other things being equal, than an agency's litigating positions.

[6]Moreover, although the *Culligan* court referred to "litigating positions of the Board (announced either in tax bulletins or merely as the result of an individual audit)" (*Culligan Water Conditioning* v. *State Bd. of Equalization, supra,* 17 Cal.3d at p. 93, fn. 4), it was not implying that all material contained in tax bulletins were "litigating positions." Indeed the *Culligan* court cited *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009 [106 Cal.Rptr. 867] as an example of a case typifying the limited judicial review appropriate for regulations of a general nature. (*Culligan, supra,* at p. 92.) The court in *Henry's Restaurants* considered the Board's interpretation of a sales tax question issued in the form of a General Sales Tax Bulletin. (30 Cal.App.3d at p. 1014.) The citation to *Henry's Restaurants* shows that the *Culligan* court's reference to "litigating positions of the Board . . . announced . . . in tax bulletins" was not to legal rulings of a general nature that might be contained in tax bulletins.

In the abstract, that argument is not without merit. But even if the statutory interpretations contained in tax annotations are not, *ab initio*, as reliable or worthy of deference as formally adopted regulations, the well-established California case law quoted above demonstrates that such reliability may be earned subsequently. Tax annotations that represent the Board's administrative practices may, if they withstand the test of time, merit a weight that initially may not have been intrinsically warranted. Or in other words, while formal APA adoption is one factor in favor of giving greater weight to an agency construction of a statute, the fact that a rule is longstanding and the statute it interprets has been reenacted are other such factors.

In sum, as the Attorney General correctly sets forth in his brief, the appropriate standard of review for Annotation No. 280.0040 can be stated as follows: (1) the court should exercise its independent judgment to determine whether the Board's legal counsel correctly construed the statute; (2) the Board's construction of the statute is nonetheless entitled to "great weight"; (3) when, as here, the Board is construing a statute it is charged with administering and that statutory interpretation is longstanding and has been acquiesced in by persons interested in the matter, and by the Legislature, it is particularly appropriate to give these interpretations great weight. (*Rizzo* v. *Board of Trustees, supra*, 27 Cal.App.4th at p. 861.)[7]

The Court of Appeal in this case, although it stated the standard of review nearly correctly, reflected some of the confusion found in our case law when it suggested that it would defer to the Board's annotation unless it was "arbitrary, capricious or without rational basis." It is therefore appropriate to remand to the Court of Appeal for reconsideration in light of the proper standard of review.

George, C. J., and Werdegar, J., concurred.

---

[7]The majority quote at length from *Skidmore* v. *Swift & Co.* (1944) 323 U.S. 134 [65 S.Ct. 161, 89 L.Ed. 124]) to describe the proper standard of judicial review of administrative rulings. I note that the United States Supreme Court has at least partly abandoned *Skidmore*'s open-ended formulation in favor of a more bright line one. (See *Chevron U.S.A.* v. *Natural Res. Def. Council* (1984) 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694].) In any case, I agree with the majority that many of the factors discussed in Justice Jackson's opinion in *Skidmore* are appropriate considerations under the governing California decisions, and that the discussion in *Skidmore* may be a useful guide to the extent it is consistent with the independent judgment/great weight test subsequently developed under California law.