Filed 11/2/20s

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| MANSON CONSTRUCTION COMPANY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF CONTRA COSTA,<br><br>    Defendant and Respondent. | A159144<br><br>(Contra Costa County<br>Sup. Ct. No. MSC1700713) |

Manson Construction Company (Manson), a marine construction and dredging company, challenges the trial court's determination that Manson's marine vessels, which carried sludge and other dredged material from harbors to disposal sites, were not "engaged in the transportation of freight" within the meaning of a property tax exemption known as the Vessel Use Exemption (Cal. Const. art. XIII, § 3, subd. (l)), and therefore did not qualify for the exemption. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Manson owns a "fleet of heavy marine construction and dredging equipment" that "includes 60 specialized vessels and over 50 barges." After

1

the Contra Costa County Assessor's Office assessed property taxes on the value of Manson's vessels for tax years 2013 and 2014, Manson filed two administrative appeals for those tax years with the Contra Costa County Assessment Appeals Board (the Board), claiming some of its vessels were exempt from taxation under the Vessel Use Exemption, which provides that "[v]essels of more than 50 tons burden in this State and engaged in the transportation of freight or passengers" "are exempt from property taxation." (Cal. Const. art. XIII, § 3, subd. (l).)

### A. 2013 Tax Appeal

At a hearing on Manson's 2013 appeal with the Board, Manson claimed the Vessel Use Exemption applied to ten of its vessels in tax year 2013. First, Manson claimed the exemption applied to four dump scows. Manson explained that its dredge cranes would reach down into the water, pull out sludge and other material (dredged material) from the bottom of the harbor, and load the dredged material into dump scows. Manson would then carry the dredged material inside the dump scows to disposal sites where the middle of the dump scows would open up and the dredged material would fall out. Second, Manson claimed the exemption applied to four barges that carried construction materials to piers and other locations where Manson was conducting marine construction. Third, Manson claimed the exemption applied to two tugboats, which were used to move the dump scows and barges from one place to another because dump scows and barges do not have motors and cannot move on their own. A Manson representative stated it is a continuous process whereby a dump scow is filled with dredged material while another dump scow that has already been filled goes to a disposal site to dump the dredged material, then returns to the harbor to be refilled.

2

Manson presented evidence that, during tax year 2013, the Army Corps of Engineers (Army Corps) hired Manson to dredge the Oakland harbor to make the waterway deeper for large ships.[1] Manson submitted a September 19, 2013 contract it entered into with Army Corps entitled "Oakland Inner & Outer Harbor Channel Maintenance Dredging Project." The "Job Description" section of the contract stated in pertinent part: "The work consists of maintenance dredging of Oakland Inner & Outer Harbor Channel of approximately 421,000 cubic yards of materials, to provide a [certain] authorized depth . . . for the Inner Harbor and Outer Harbor Channels. Dredged material excavated from the Oakland Inner and Outer Harbor Channels shall be transported and off loaded at [two specified disposal sites] and at any permitted upland site of the Contractor's choosing."

Manson dredged the harbor pursuant to the contract and disposed of the dredged material in two locations. According to Manson, it took about 8 to 12 hours to transport the dredged material to one of the disposal sites; Manson did not know how long it took to transport the dredged material to the other disposal site. A Manson representative estimated that it usually takes about 18 hours to fill a dump scow with dredged material. The chair of the Board asked, "Do you consider sludge that's dug up on the bay to be freight?" A Manson representative responded that he did, because "[s]o long as somebody is hiring you to move it, it's considered freight. . . ." A Board

---

[1]     Manson gave additional examples of dredging and other work it has performed over the years, but it appears that most, if not all, of the other work was performed outside of the 2013 tax year, and was therefore not relevant in determining whether the vessels were exempt from property taxation that tax year.

member commented, "my impression is that your particular job is to dredge, and secondary function is to get rid of the dredge" "or the sludge."

The Contra Costa County Assessor's Office (the County) conceded all of the vessels at issue were "more than 50 tons burden" but argued they did not qualify for the Vessel Use Exemption because Manson was required to—but did not—"properly and timely claim the exemption" by filing a "vessel property statement" known as Form 576-D.  The County asserted that "even if [Manson] had filed [Form 576-D], . . . [it] still would not qualify for the . . . exemption because they're not engaged in the transportation of freight as defined under the law."

Manson responded that the County never suggested or instructed Manson to submit the form and instead provided Manson with a different form, Form 571, which Manson did complete and submit.  Manson also argued its vessels qualified for the exemption because the vessels were hired to transport dredged material and the dredged material constituted "freight."

After the hearing, the parties submitted briefing on the issues and the Board issued a written order denying Manson's request for an exemption on the basis that Manson failed to file Form 576-D by April 1 as mandated by Revenue and Taxation Code section 251 subdivision (a) and Board procedures.  As to the substantive issue of whether the vessels transported freight, the Board stated only that the vessels "are of more than 50 tons burden and do not carry passengers.  They are used to carry the spoils of [Manson's] dredging operations out to sea where they are dumped."

### B. 2014 Tax Appeal

At a hearing on Manson's 2014 appeal with the Board, Manson claimed the Vessel Use Exemption applied to six vessels—four dump scows and two tugboats.  Manson acknowledged it did not file Form 576-D and explained

4

that by the time it hired a new accountant who informed Manson that its vessels might qualify for the exemption, the time to file Form 576-D for both tax years 2013 and 2014 had passed. After extensive discussion regarding whether Manson's claim should be denied based on its failure to file Form 576-D, the Board stated it was "withholding judgment on that . . . issue" and was going to proceed on the other issue of whether the Vessel Use Exemption applied to the six vessels.

As before, Manson explained that it dredged material with dredge cranes, placed the dredged material onto dump scows, and used tugboats to take the dump scows to disposal sites. The County again argued Manson was not entitled to the exemption because it failed to file Form 576-D. The County also argued that to qualify for the exemption, the vessels must be transporting "freight," which "has a very specific meaning that's defined in case law. And it's basically transporting goods from a consignor to a consignee. It's not dredging materials and transporting it and dumping it." The County argued the dredged material has no consignor or consignee and is "not delivered or sold to a third party." The County noted that customers paid Manson to *dredge* materials, and that the transportation and disposal of the dredged material was simply "part of the [dredging] service." The County argued Manson had also failed to submit sufficient documentation to show its vessels were engaged in the transportation of freight because it presented no evidence regarding the number of days the vessels were used for transportation of freight in tax year 2014, versus the number of days they were idle or performed other work.

The Board issued a Findings and Decision stating Manson "did not meet its burden of establishing that any of its vessels are engaged in the transportation of freight or passengers. Instead, the evidence shows that

5

[Manson] is hired primarily to perform dredging services, and its vessels are primarily used to move dredged waste, such as sand, silt, and mud, as a byproduct of the dredging services it provides." The Board found that Manson's customers "do not own the dredged waste, because it is dredged from the bottom of the bay, port, or ocean. The byproduct is not a 'good' . . . [Citation.] In sum, the evidence establishes that [Manson's] vessels are not engaged in the transportation of freight or passengers, and that there is no consignor-consignee relationship between [Manson] and its customers." The Board found Manson's claim also failed because Manson did not file Form 576-D: "[Manson] did not follow the proper procedural steps [established by the Board of Equalization] to qualify any of its vessels for [the Vessel Use Exemption]."

### C. Superior Court Action

On April 24, 2017, Manson filed a complaint in Contra Costa County Superior Court against the County alleging causes of action for declaratory and injunctive relief, constructive trust, accounting, money had and received, mandamus, violation of state and federal constitution, and conversion. In its second amended complaint—which is the operative complaint—Manson asserted a single cause of action for "Refund of Property Taxes" and alleged the County "erroneously collected property tax bills" in tax years 2013 and 2014.

On February 9, 2018, the County moved for judgment on the pleadings, asserting Manson's vessels did not transport freight as a matter of law and therefore did not qualify for the Vessel Use Exemption. The trial court denied the motion on the basis that Manson had alleged the federal government hired it to transport freight. The court emphasized that "[t]he parties are at the pleading stage" and stated, "For all the court knows,

6

[Manson may have] a 'Transportation Agreement' or some other contract with the Federal Government. . . ."

After the matter was set for trial, Manson filed a bifurcation motion seeking to have the trial court first decide whether Manson should be allowed to introduce evidence beyond the administrative record, before proceeding to trial on the substantive issue of whether Manson's vessels qualified for the Vessel Use Exemption. The court denied the motion, stating, "There is no reason to grant a bifurcation. The standard of review on a tax refund case . . . confines the court to the administrative record, whether the issues are factual or legal in nature."

Thereafter, the parties submitted various pleadings and the matter was submitted on the parties' trial briefs and supporting papers, the administrative record of Manson's 2013 and 2014 appeals before the Board, and arguments of counsel. On October 23, 2019, the trial court issued a judgment denying Manson's claim for refund of property taxes, stating: "Under any standard of review, Manson is not entitled to its claimed property tax exemption because it was not transporting freight and it failed to timely claim the exemption in the manner required." The court determined there was sufficient evidence to support the Board's findings that Manson's vessels were " 'used to carry the spoils of [Manson's] dredging operations out to sea where they are dumped,' " that Manson was "hired primarily to perform *dredging* services not *transportation* services," and that "its customers 'do not own the dredged material because it is dredged from the bottom of the bay, port, or ocean.' " The court then stated: "If a pure legal issue remains for decision by the court, it is whether the carrying of dredged material not owned by customers out to sea where it is dumped qualifies as the transportation of freight. The court concludes it does not." Noting that the

word "freight" is defined as property delivered by a consignor to a consignee, the court determined that the "underwater dirt" that Manson dredged and transported for the purpose of "dump[ing] . . . at sea" was not freight. "No one delivered the material to Manson and Manson delivered it to no one." The court also found Manson failed to file the proper form, Form 576-D, to claim the exemption. Manson appeals.

## DISCUSSION

We conclude Manson's vessels did not qualify for the Vessel Use Exemption for tax years 2013 and 2014 because the vessels, which carried sludge and other materials dredged from the bottom of the harbor to disposal sites, were not "engaged in the transportation of freight" within the meaning of the exemption.

### *A. General Principles*

Under the existing constitutional scheme, "[a]ll property is taxable" "unless otherwise provided." (Cal.Const., art. XIII, § 1, subd. (a).) Constitutional provisions granting exemptions from taxation, such as the Vessel Use Exemption that is at issue in this case, " 'are strictly construed to the end that such concession will be neither enlarged nor extended beyond the plain meaning of the language employed.' " (*Smith-Rice Heavy Lifts, Inc. v. Los Angeles County* (1967) 256 Cal.App.2d 190, 194 (*Smith-Rice Heavy Lifts*).) "The rule has long been established in California that a presumption exists in favor of the [v]alidity of a tax assessment" and that it is the taxpayer's burden "to prove . . . the assessment was unauthorized by law." (*Id.* at p. 195.) In interpreting an enactment, we give words " 'their ordinary and popular signification' " if they are " 'reasonably free from ambiguity and uncertainty.' " (*County of Los Angeles v. Craig* (1940) 38 Cal.App.2d 58, 61.) If the language is susceptible to more than one reasonable construction, it is

8

appropriate to turn to extrinsic aids, including the legislative history of the enactment, to ascertain its meaning. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29-30.) In the context of a tax exemption, any doubts concerning the applicability of the exemption are to be resolved against the taxpayer. (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 614.)

A county assessment appeals board " 'is a constitutional agency exercising quasi-judicial powers delegated to the agency by the Constitution' [citation] . . . ." (*Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 679.) "In light of the semijudicial status of local boards, '[the Board's] factual determinations are entitled on appeal to the same deference due a judicial decision, i.e., review under the substantial evidence standard.' [Citation.]" (*Ibid*.) When the assessment appeals board decides a question of law, such as the interpretation of a statute, courts are authorized to conduct an independent reassessment. (*Ibid*.) In reviewing a property tax assessment, however, the court presumes the assessor's office properly performed its duty and that the assessment was both regularly and correctly made. (*California Minerals, L.P. v. County of Kern* (2007) 152 Cal.App.4th 1016, 1022; see *Auerbach v. Los Angeles County Assessment Appeals Bd. No. 2* (2008) 167 Cal.App.4th 1428, 1442 [gave deference to the Board's interpretation of an exemption given the Board's expertise in property tax matters]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [courts are more likely to defer to an administrative agency's interpretation where " 'the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion' "].)

9

## B. Vessel Use Exemption

The Vessel Use Exemption was enacted in 1914 "to assist the shipping industry in this state." (*County of Los Angeles v. Craig, supra*, 38 Cal.App.2d at p. 61.) "[T]he history of the constitutional amendment . . . particularly the arguments to the voters at the time of its initial adoption in 1914, and readoption in 1932, makes clear that the principal purpose behind the creation of this tax exemption was to insure that California obtained, and thereafter retained, its fair share of the increased maritime industry resulting from the opening of the Panama Canal and the national effort to increase the size of America's merchant fleet in the face of the then impending first World War. The obvious intent of its proponents was to encourage persons and corporations owning vessels engaged in interstate and international operations to establish their headquarters and home ports in California rather than in other coastal states which had theretofore extended tax benefits to such maritime operations. [Citations.]" (*Smith-Rice Heavy Lifts, supra*, 256 Cal.App.2d at p. 197.)[2]

The Vessel Use Exemption has been expanded beyond the authors' original limited intent of supporting merchant fleet and interstate and international commerce. For example, in *Alalunga Sport Fishes, Inc. v.*

---

[2]    Manson has asked us to take judicial notice of additional legislative materials, including documents that show the exemption was proposed because other states such as New York and Washington already exempted vessels from property taxation, while California did not. Manson also argues the materials show the Legislature intended to give the word "freight" a broad meaning because "the language of [the] . . . amendment eliminated any reference to the exemption as applying to 'ocean commerce,' " in contrast to New York and Washington's laws, which explicitly limit their exemptions to "ocean commerce" or "trade." We grant Manson's unopposed request for judicial notice and consider the materials to the extent they are relevant to our determination of the appeal.

*County of San Diego* (1967) 247 Cal.App.2d 663, 665, 668 (*Alalunga*), the exemption was extended to include sportfishing vessels that were hired to transport passengers out to sea to fish or sightsee.  In *Star & Crescent Boat Co. v. County of San Diego* (1958) 163 Cal.App.2d 534, 535, 539 (*Star & Crescent Boat*), the exemption was extended to barges and tugs that were hired by oil companies to transport the oil companies' petroleum products intrastate, from Los Angeles to San Diego.  (*See Smith-Rice Heavy Lifts*, *supra*, 256 Cal.App.2d at p. 198 [observing that the exemption is no longer "restricted to 'seagoing vessels' engaged 'only in trade with foreign countries' " and has been extended to include vessels " 'employed in the coasting trade or fisheries' "].)

Despite these expansions, however, the exemption is still limited to vessels that are actually " ' "engaged in the transportation of freight or passengers." ' "  " 'This phrase must be given some meaning' " and should not be interpreted to mean any vessel that carries any property or persons.  (*Smith-Rice Heavy Lifts*, *supra*, 256 Cal.App.2d at p. 196, quoting *Dragich v. Los Angeles County* (1939) 30 Cal.App.2d 397, 399 (*Dragich*).)  "[T]o give this phrase such meaning would be to render it meaningless" as all vessels are used to carry some sort of "property or persons or both."  (*Dragich*, *supra*, at p. 399.)

In *Dragich*, the plaintiffs, as part of their own fishing operation, sent their fishing boats out to sea to catch fish and return to their port or go to other ports to sell the caught fish.  (30 Cal.App.2d at p. 398.)  They argued the exemption applied because their boats were " 'engaged in the transportation of freight or passengers' " from port to port.  (*Id.* at p. 400.)  The Court of Appeal disagreed, stating:  "The word 'freight' has more than one meaning but generally denotes property transported by a carrier from a

11

consignor to a consignee. (Civ. Code, § 2110.) In one accepted sense, it means 'the hire or compensation paid by anyone for the transport of goods' [citation], and when used to denote the property transported, it carries the definite implication that the transportation is for hire. A similar implication is found in the use of the word 'passengers.' A 'passenger' is defined as '[a] traveler by some established public conveyance, as a coach, omnibus, steamboat, railroad train, etc.' [Citation.] Said definition implies carriage for hire and it further appears that the word 'passenger' is quite generally used in contradistinction to the word 'guest.' [Citations.]" (*Id.* at p. 399.) "With these definitions in mind and reading the phrase as a whole," the court concluded "that the phrase 'engaged in the transportation of freight or passengers' . . . means 'engaged in the transportation of property or persons *for hire.*'" (*Id.* at pp. 399-400, italics added.) Because the plaintiffs were using their fishing boats to go out to sea to catch fish for wholesale, the vessels were not engaged in the transportation of "passengers," i.e., "persons for hire," and were therefore not exempt from property taxation. (*Ibid.*)

Other courts have followed *Dragich* in concluding that vessels must be hired to "transport[]" "freight or passengers" in order to qualify for the exemption. In *Crivello v. San Diego County* (1942) 50 Cal.App.2d 713, 715, fishing boats that left their port, "manned by a fishing crew, and carrying only fishing equipment and sufficient food to supply the crew until the return to port with the catch of fish," did not qualify for the exemption for the same reasons set forth in *Dragich*. In *Alalunga, supra*, 247 Cal.App.2d at p. 668, the Court of Appeal cited with approval the holding in *Dragich* that the property or persons on the vessels must be transported "for hire." In concluding that sportfishing vessels that took people out to sea to fish or sightsee qualified for the exemption, the court emphasized that the people

12

the vessels transported were "not guests, since they pay for being conveyed, but are passengers" who purchased tickets to be transported. (*Alalunga, supra*, 247 Cal.App.2d at p. 668.) In *Crowley Launch & Tugboat Co. v. County of Los Angeles* (1971) 16 Cal.App.3d 437, 438, 441 (*Crowley Launch & Tugboat*), the Court of Appeal held a tugboat was not exempt where it was used as a "harbor tug" that would attach to a cargo or passenger vessel and assist that vessel in navigating the waters and channels of the harbor. In reaching this conclusion, the court noted "[t]here were no dealings between consignors or consignees of [the] cargo or passengers," i.e., the tugboat had not been hired to transport the cargo or passengers that were on the vessels that it towed, but to assist those vessels in navigating the harbor. (*Id.* at p. 438.)

We note, as the court in *Dragich* did, that "freight" is defined in Civil Code section 2110 in the context of a consignor-consignee relationship, i.e., as property that is delivered from a consignor to a consignee. This Civil Code section was enacted in 1872 (Civil Code, § 2) and we presume the Legislature was aware of the definition of "freight" at the time it enacted the Vessel Use Exemption. In addition, Merriam-Webster's Dictionary defines freight as "the compensation paid for the transportation of goods." (Merriam-Webster.com <https://www.merriam-webster.com/dictionary/freights> [as of Oct. 15, 2020].) The Legislature's use of the word "freight" therefore suggests the exemption was intended to apply to vessels that are hired to carry goods from a consignor to a consignee. Further, although courts have expanded the scope of the exemption over the years to include fishing boats and intrastate (as opposed to interstate and international) commerce, the Legislature has never amended the exemption to extend it to vessels that carry any tangible item or person for hire. There is also nothing to indicate that the purpose of

13

the exemption has changed from its original purpose of protecting the shipping industry by encouraging commercial shipping and insuring California retains its fair share of the merchant shipping industry over other states that may provide similar exemptions. The above definitions, the context in which the exemption was enacted, and the way in which courts have since interpreted the exemption, show that Manson's vessels were not "engaged in the transportation of freight" for hire when they moved dredged material from the harbor to disposal sites as part of the dredging work they performed.

Manson did not present any relevant authority to show that anyone owned or controlled the sludge it dredged, or that the dredged material could be considered goods, delivered from a consignor to a consignee. Instead, the evidence showed the dump scows and barges were moved from the harbor to disposal sites for the purpose of being emptied out so that they could return to the harbor and continue to perform the work for which they were hired, i.e., to be filled up with more dredged material for disposal. In other words, the carrying of the dredged material from the harbor to the disposal sites was merely a necessary byproduct of, and incidental to, the dredging work the vessels were hired to perform. As noted, in *Crowley Launch & Tugboat*, *supra*, 16 Cal.App.3d 437, a tugboat that towed vessels that carried cargo or passengers was not "engaged in the transportation of freight or passengers" because it were hired to assist those vessels in navigating the harbor, not to transport the cargo or passenger the vessels carried. Similarly, here, Manson's vessels were engaged in a dredging project, not in the transportation of goods for hire.

Manson argues that the case of *Star & Crescent Boat*, *supra*, 163 Cal.App.2d 534 supports a broad construction of the word "freight."

14

According to Manson, the court there held that "freight" includes "raw materials" and that "transportation of freight or property means picking up the material in one location and dropping it off at another." The holding in *Star & Crescent Boat*, however, was not as broad as Manson presents it to be. There, the court held the exemption applied to barges and tugs where: (1) the owners of the barges and tugs were hired by oil companies pursuant to contracts entitled "Transportation Agreement" to transport petroleum products from Los Angeles to San Diego; (2) the oil companies owned the petroleum products that were transported; (3) the contract referred to the barges and tugs as "carriers"; and (4) the owners of the vessels paid significant transportation taxes to the federal government for transporting the oil companies' products. (163 Cal.App.2d at pp. 535, 538.) Thus, the court did not hold that "transportation" simply means picking up material and moving it. In contrast to the situation in *Star & Crescent Boat*, here, the evidence shows the contract between Manson and Army Corps was for the dredging of the Oakland harbor to make the waterway deeper for large ships. The dredged waste was not "goods" like the petroleum products that were owned by the oil companies and delivered into the stream of commerce, and there was nothing in the record indicating the incidental moving of the dredged material to disposal sites triggered federal transportation taxes.

Manson also points out that the word "freight" has been given broader meanings in other contexts. The cases to which Manson cites, however, are not from California and do not concern the definition of the word "freight" in the context the Vessel Use Exemption. Thus, they do not support Manson's argument that the word "freight" should be interpreted more broadly for purposes of the exemption. (*See Smith-Rice Heavy Lifts, supra*, 256 Cal.App.2d at p. 199 [tax exemptions are strictly construed].) We conclude

15

the Vessel Use Exemption did not apply to Manson's vessels, which were not "engaged in the transportation of freight" within the meaning of the exemption.[3]

## DISPOSITION

The judgment is affirmed. The County shall recover its costs on appeal.

---

[3] The County argues that Manson's claim for an exemption fails for two additional reasons: (1) Manson did not timely file Form 576-D as required by statute and Board procedures; and (2) Manson presented insufficient evidence to show its vessels were "primarily" engaged in the transportation of freight, as required by case law. In light of our conclusion that Manson's vessels did not qualify for the Vessel Use Exemption as they were not "engaged in the transportation of freight," we need not, and do not, address these additional arguments.

_____
Petrou, J.

WE CONCUR:


_____
Siggins, P.J.


_____
Fujisaki, J.

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Steve K. Austin

Counsel:        Law Offices of Stephen M. Harris, Stephen M. Harris; Gangloff and Gangloff, Ronald Gangloff and David Gangloff, for Plaintiff and Appellant.

        Sharon L. Anderson, County Counsel, Rebecca J. Hooley and Kathleen S. Kizer, Deputy County Counsel, for Defendant and Respondent.