Filed 9/3/25

# IN THE SUPREME COURT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, INC., et al.,

Petitioners,

v.

PUBLIC UTILITIES COMMISSION,

Respondent;

PACIFIC GAS AND ELECTRIC COMPANY et al.,

Real Parties in Interest.

S283614

First Appellate District, Division Three

A167721

Cal.P.U.C. Decision No. 22-12-056

---

## ORDER MODIFYING OPINION

THE COURT:

The request for modification of opinion filed on August 22, 2025, is granted. The opinion in this matter, filed on August 7, 2025, is modified as follows:

1. The citation after the first full sentence on page 15 of the slip opinion is modified to read:

   (§§ 1757.1, subd. (a), 1757, subd. (a); see Code Civ. Proc., § 1094.5.)

2. The first sentence of the first full paragraph on page 17 of the slip opinion is modified to read:

At bottom, we see no reason to conclude that a court performing the inquiry required by the amended version of section 1757, subdivision (a) or section 1757.1, subdivision (a) should employ the same inquiry prescribed under preamendment law, under which "the [C]ommission's interpretation of the Public Utilities Code" must be upheld "unless [that interpretation] fails to bear a reasonable relation to statutory purposes and language."

This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, INC., et al.,
Petitioners,

v.

PUBLIC UTILITIES COMMISSION,
Respondent;

PACIFIC GAS AND ELECTRIC COMPANY et al.,
Real Parties in Interest.

S283614

First Appellate District, Division Three
A167721

Cal.P.U.C. Decision No. 22-12-056

August 7, 2025

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins and Evans concurred.

CENTER FOR BIOLOGICAL DIVERSITY, INC. v.
PUBLIC UTILITIES COMMISSION

S283614


Opinion of the Court by Kruger, J.


This case concerns the degree of deference that courts should afford to the Public Utilities Commission's interpretation of the Public Utilities Code.

For nearly a century, statutory law directed courts to uphold the Commission's decisions so long as the Commission had "regularly pursued its authority." (Stats. 1911, 1st Ex. Sess. 1911, ch. 14, § 67, pp. 55, 56; Stats. 1951, ch. 764, p. 2090.) During this era, we instructed that "the [C]ommission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language." (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410–411 (*Greyhound*).) But as the century drew to a close, the Legislature revised the law to expand judicial review of most Commission decisions. (See Stats. 1996, ch. 855, § 7, p. 4554; see *id.*, § 8, pp. 4554–4555; Stats. 1998, ch. 886, §§ 11–14.5, pp. 5808–5811; Stats. 2000, ch. 953, §§ 3–6, pp. 7021–7023.)

The question before us is whether the highly deferential approach of *Greyhound* continues to apply in cases affected by this significant legislative change. We conclude it does not. We reverse the judgment of the Court of Appeal in this matter, which relied on *Greyhound*, and remand for the court to conduct the appropriate inquiry under current law.

1

**I.**

Broadly speaking, the underlying dispute in this case concerns rooftop solar panels and other means by which utility customers can generate their own power. (See Pub. Util. Code, § 2802.) Solar panels may generate less — or more — electricity than their owners need at a particular time. At night or on a cloudy day, for example, a utility customer with solar panels may need to draw additional electricity from the power grid. On a sunny morning, by contrast, the panels may generate more electricity than the customer needs, allowing the customer to export excess energy to the grid.

Since 1995, the Legislature has required utilities to compensate "customer-generators" for the energy those customers export. (Stats. 1995, ch. 369, § 1, pp. 1917–1919.) Initially, customers could use the electricity they supplied *to* a utility to offset the amount of electricity they received *from* that utility. (*Id.*, § 1, pp. 1918–1919.) "By offsetting exported power against imported power," this approach "functionally required utilities to purchase excess power generated by residential solar power systems at the price paid by their customers for electricity." (*Center for Biological Diversity, Inc. v. Public Utilities Com.* (2023) 98 Cal.App.5th 20, 25 (*Center for Biological Diversity*).) Critics argued that the approach overcompensated customer-generators, because it treated energy exported by customers as equivalent in value to energy generated and delivered on demand by utility companies — effectively shifting more of the burden of paying for utility services onto customers who lacked expensive solar power systems. (*Id.* at pp. 25–26.)

In 2013, the Legislature instructed the Commission to revisit the appropriate amount of compensation for customer-

generators. (See Stats. 2013, ch. 611, § 11, pp. 5030–5031.) The resulting measure, Public Utilities Code section 2827.1 (section 2827.1), directs the Commission to set an applicable "standard contract or tariff . . . for eligible customer-generators" and specifies several factors that the Commission is required to consider, including "[e]nsur[ing] that the standard contract or tariff made available to eligible customer-generators is based on the costs and benefits of the renewable electrical generation facility" and "[e]nsur[ing] that the total benefits of the standard contract or tariff to all customers and the electrical system are approximately equal to the total costs." (*Id.*, subd. (b)(3), (4).) In response, following an interim measure, the Commission in 2022 adopted a tariff that "significantly reduces the price utilities pay for customer-generated power." (*Center for Biological Diversity*, *supra*, 98 Cal.App.5th at p. 24.)

Petitioners Center for Biological Diversity, Inc., Environmental Working Group, and the Protect Our Communities Foundation maintain that the Commission's tariff is inconsistent with section 2827.1. They petitioned for a writ of review in the Court of Appeal. (See Pub. Util. Code, § 1756, subd. (a); *Center for Biological Diversity*, *supra*, 98 Cal.App.5th at p. 24.) Among other things, they argued that the Commission did not "[e]nsure that the standard contract or tariff . . . is based on the costs and benefits of the renewable electrical generation facility," as section 2827.1, subdivision (b)(3) requires, because the Commission "fail[ed] to take account of all the benefits of renewable energy, particularly those conferred on society generally" (*Center for Biological Diversity*, at p. 30). They also argued that the Commission failed to "[e]nsure that the standard contract or tariff . . . ensures that customer-sited

renewable distributed generation continues to grow sustainably" and to "include specific alternatives designed for growth among residential customers in disadvantaged communities," as section 2827.1, subdivision (b)(1) instructs. (*Center for Biological Diversity*, at pp. 37–41.)

The Court of Appeal granted the petition for a writ of review and affirmed the decision of the Commission. (*Center for Biological Diversity*, *supra,* 98 Cal.App.5th at pp. 29, 43.) In reviewing that decision, the court asked the question set forth in *Greyhound*: namely, whether "the Commission's interpretation" of section 2827.1 " ' "fails to bear a reasonable relation to statutory purposes and language." ' " (*Center for Biological Diversity*, at p. 29.) The court upheld the Commission's decision under this "uniquely deferential standard of review." (*Id.* at p. 31.) The court focused its inquiry on whether statutory language "compel[led]" (*ibid.*) or "indisputably require[d]" (*id.* at p. 32) adoption of petitioners' position. The court stated: "To the extent petitioners are arguing . . . that the Commission erred in basing the successor tariff on the costs and benefits of renewable power to generators and ratepayers, rather than the costs and benefits to society at large, we find the Commission's approach to bear a reasonable relation to its statutory mandate. Our standard of review allows for no further inquiry." (*Id.* at p. 34.) Similarly, in addressing petitioners' contention that the Commission could not rely on pretariff initiatives to satisfy its obligation to "include specific alternatives designed for growth among residential customers in disadvantaged communities" (§ 2827.1, subd. (b)(1)), the court upheld the Commission's approach on the ground that it "bear[s]

a reasonable relation to the statutory purposes and language" (*Center for Biological Diversity*, at p. 40).

Petitioners sought our review. At the outset, they asked us to address the continuing vitality of the *Greyhound* framework on which the Court of Appeal's decision rested. Although they had not raised the *Greyhound* issue in their merits briefing in the Court of Appeal, neither the Commission nor the real parties in interest have objected to our consideration of that issue. For that reason, and because the issue presents a question of law of considerable statewide importance, we granted review and will address it.

## II.

### A.

" ' "The [Public Utilities] [C]ommission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1–6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.)" ' [Citation.] 'The Constitution also confers plenary power on the Legislature to "establish the manner and scope of review of commission action in a court of record" (Cal. Const., art. XII, § 5).' " (*Gantner v. PG&E Corp.* (2023) 15 Cal.5th 396, 401–402.)

The relevant constitutional provisions date to October 1911, when voters passed a package of Progressive Era constitutional amendments. One of these amendments expanded the powers of the Railroad Commission (later renamed the Public Utilities Commission) to regulate public

utilities. (*City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1181; see *Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1038 (*McPherson*).) After decades of agency capture had rendered the Railroad Commission ineffectual, the voters aimed to ensure the Commission had all the power necessary to perform its regulatory functions. (*McPherson,* at p. 1040; see generally *id.* at pp. 1037–1042.)

The same year, the Legislature enacted the Public Utilities Act of 1911. The Act set out the then-Railroad Commission's authority to regulate various utilities, including water, energy, transportation, and telecommunications companies. (See Stats. 1911, 1st Ex. Sess. 1911, ch. 14, §§ 2, 31, pp. 18–22, 35.) The Act also set forth a narrow provision for judicial review of Commission decisions. Such review could be had only in the Supreme Court. Further, the Act instructed, "[t]he review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the State of California." (Stats. 1911, 1st Ex. Sess. 1911, ch. 14, § 67, pp. 55, 56.) By prescribing only a narrow scope of judicial review, the Legislature restricted the extent to which the Commission could be "hampered in the performance of any official act by any court." (*Sexton v. Atchison etc. Ry. Co.* (1916) 173 Cal. 760, 764.)

The Legislature retained this "regularly pursued" standard through multiple iterations of the Public Utilities Act, and, later, the enactment of the Public Utilities Code in 1951. (Stats. 1951, ch. 764, p. 2090; see *id.*, §§ 1, 2, p. 2025; see

*Southern Pac. Co. v. Public Utilities Com.* (1953) 41 Cal.2d 354, 357–362 [tracing the history of the provision]; see also Stats. 1915, ch. 91, § 67, p. 161 ["regularly pursued its authority"]; Stats. 1933, ch. 442, § 1, p. 1157 [same].)  The Code provided that a challenge to an order or decision of the Commission could be brought in this court "for the purpose of having the lawfulness of the . . . order or decision . . . inquired into and determined."  (Stats. 1951, ch. 764,  p. 2090.)  As relevant, the Code further specified the scope of this court's review in terms that closely track its 1911 predecessor:  "No new or additional evidence may be introduced in the Supreme Court, but the cause shall be heard on the record of the commission as certified to by it.  *The review shall not be extended further than to determine whether the commission has regularly pursued its authority*, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State.  The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article.  Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination."  (Stats. 1951, ch. 764, p. 2090, italics added; see also *id.*, p. 2091.)

We considered the meaning of this review provision in *Greyhound*, *supra*, 68 Cal.2d at pages 409–411, which concerned the validity of a Commission decision requiring a commuter bus operator to extend service over certain routes in the San Francisco Bay Area.  The challenger argued that the Commission had "not regularly pursued its authority" because the statute on which the Commission relied for its authority did

7

not, in fact, authorize the order. (*Id.* at p. 410.) In rejecting this argument, we wrote: "There is a strong presumption of validity of the commission's decisions [citations], and the commission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language." (*Id.* at pp. 410–411.)

This formulation, which the Court of Appeal in this case correctly described as "uniquely deferential" (*Center for Biological Diversity*, *supra*, 98 Cal.App.5th at p. 31), differs from the standard generally applicable to agencies' statutory interpretations. As explained further below, while the level of deference owed to such interpretations may vary depending on the circumstances, courts remain the final arbiters of statutory meaning. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 (*Yamaha*); pt. II.B, *post*.)

**B.**

The statutory provision governing judicial review of Commission decisions remained largely unchanged for nearly a century. Beginning in the mid-1990s, however, in response to deregulation in the energy and other utility markets, the Legislature passed a series of amendments that expanded the scope of review. (Stats. 1998, ch. 886, § 1.5, subd. (a), p. 5796; see *McPherson*, *supra*, 38 Cal.4th at p. 1025 [describing changes to the energy industry].) These changes eliminated the "regularly pursued its authority" standard for review of most Commission decisions. (See Stats. 1996, ch. 855, § 7, p. 4554; see *id.*, § 8, pp. 4554–4555; Stats. 1998, ch. 886, §§ 11–14.5, pp. 5808–5811; Stats. 2000, ch. 953, §§ 3–6, pp. 7021–7023.) Even after these modifications, however, courts have continued to cite *Greyhound* when applying the modified statutory

standard of review, albeit without much explanation or discussion.  (See, e.g., *Ames v. Public Utilities Com.* (2011) 197 Cal.App.4th 1411, 1418.)  After careful examination of the effect of the legislative changes, we now conclude that, for the category of cases in which the "regularly pursued its authority" standard is no longer in effect, the degree of deference prescribed in *Greyhound* no longer governs review under Public Utilities Code sections 1757 (section 1757) and 1757.1 (section 1757.1).

As currently written, sections 1757 and 1757.1 specify several bases on which a reviewing court may set aside a decision of the Commission.  Section 1757 applies to complaint and enforcement proceedings and ratemaking and licensing decisions that are "addressed to specific parties," while section 1757.1 applies in any proceedings not covered by section 1757.  (See §§ 1757, subd. (a), 1757.1, subd. (a).)   Section 1757.1, subdivision (a), extends review to whether "(1) The order or decision of the commission was an abuse of discretion.   [¶] (2) The commission has not proceeded in the manner required by law.  [¶] (3) The commission acted without, or in excess of, its powers or jurisdiction.  [¶] (4) The decision of the commission is not supported by the findings.  [¶] (5) The order or decision was procured by fraud.   [or] [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution."  When applicable, section 1757 extends review to those same considerations, as well as whether "[t]he findings in the decision of the commission are not supported by substantial evidence in light of the whole record."  (§ 1757, subd. (a)(4); see *id.*, subd. (a).)

Both sections retain the "regularly pursued its authority" standard, but only for decisions pertaining "solely to water corporations." (§ 1757, subd. (c); § 1757.1, subd. (b); see, e.g., *Golden State Water Co. v. Public Utilities Com.* (2024) 16 Cal.5th 380.) For all other relevant Commission decisions — whether they concern telecommunications, transportation, or, as here, energy — the statutes prescribe an inquiry that parallels the inquiry prescribed under the general administrative mandamus statute, Code of Civil Procedure section 1094.5. (See Code Civ. Proc., § 1094.5, subd. (b) ["The inquiry . . . shall extend to . . . whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law."]; see, e.g., *Christensen v. Lightbourne* (2019) 7 Cal.5th 761, 770–771.)

We presume that when the Legislature adopted a review provision that borrowed heavily from Code of Civil Procedure section 1094.5, the choice was intentional. (Cf. *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1043 ["When the Legislature uses language identical to that of an existing statute in newly enacted legislation, it is presumed that the same construction is intended"].) It follows that review under these provisions should parallel the review that applies to other administrative decisions, rather than the uniquely deferential form of review described in *Greyhound*.

To the extent there can be any doubt on this point, the Legislature put it plainly in the uncodified preamble to the 1998 legislation. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925 [relying on uncodified preamble].) With the 1998 enactment, the Legislature found and declared "that the conversion of the energy, transportation, and

telecommunications industries from traditional regulated markets to competitive markets necessitates a change in the judicial review of Public Utilities Commission decisions that pertain to those industries. The Legislature finds that the activities of the energy, telecommunications, and transportation industries will require expanded access to the court system at all levels." (Stats. 1998, ch. 886, § 1.5, subd. (a), p. 5796.) "It is the intent of the Legislature in enacting the judicial review provisions of this act to, in part, establish the manner and scope of review taken from decisions of the Public Utilities Commission. *It is further the intent of the Legislature to conform judicial review of the Public Utilities Commission decisions* that pertain to utility service providers with competitive markets *to be consistent with judicial review of the other state agencies*." (*Id.*, § 1.5, subd. (b), p. 5796, italics added; see also *id.*, subd. (a), p. 5796 [explaining that the statute retained the "regularly pursued its authority" standard for water corporations because "the water supply industry continues to operate in a traditional, noncompetitive utility market"].)

Where, as here, the primary question is whether a state agency has acted in a manner consistent with the statute it purports to implement, judicial review typically differs meaningfully from the approach we described in *Greyhound*. Our leading case concerning review of an agency's statutory interpretation is *Yamaha*, *supra*, 19 Cal.4th 1. In *Yamaha*, we distinguished between "opposite ends of an administrative continuum" (*id.* at p. 6, fn. 3): (i) "quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law'" and (ii) "[a]n agency interpretation of the meaning and legal effect of a statute" (*id.* at p. 7). "An agency

interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Ibid.*; see *id.* at pp. 12–15 [describing relevant factors].) Although courts should "respect[] [an] agency's interpretation" of a statute that the agency administers (*id.* at p. 7) — and may, in appropriate circumstances, afford that interpretation " 'great weight' " (*id.* at p. 12) — "[c]ourts must . . . independently judge the text of the statute" (*id.* at p. 7). "[A]n agency's interpretation is one among several tools available to the court" (*ibid.*), but the court cannot abdicate "a quintessential judicial duty — applying its independent judgment de novo to the merits of the legal issue before it" (*id.* at p. 8, italics omitted).

Quasi-legislative regulations, we have explained, are subject to a substantially narrower scope of review: "If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Yamaha, supra,* 19 Cal.4th at pp. 10–11.) But, as we explained in *Yamaha,* "even quasi-legislative rules are reviewed independently for consistency with controlling law," in that a court does not defer to the agency's view of whether the regulation lies within the scope of the lawmaking authority

delegated by the Legislature. (*Id.* at p. 11, fn. 4.) In other words, we review independently whether an agency has lawmaking authority, even if it may be appropriate to defer to an agency's reasonable exercise of any such authority.

The Court of Appeal in this case did not cite *Yamaha*, nor did its analysis resemble the *Yamaha* inquiry. The court instead relied on the "uniquely deferential" approach it understood to be required under *Greyhound*. (*Center for Biological Diversity*, *supra*, 98 Cal.App.5th at p. 31.) It explained, for example: "[W]e find the Commission's approach to bear a reasonable relation to its statutory mandate. Our standard of review allows for no further inquiry." (*Id.* at p. 34; see *id.* at pp. 31, 32, 40, 43.) Its discussion addressed whether statutory language "compel[led]" (*id.* at p. 31) or "indisputably require[d]" (*id.* at p. 32) adoption of petitioners' position, rather than whether, in the Court of Appeal's independent judgment, petitioners' position was correct.

We do not decide whether the court's ultimate conclusion that the tariff is consistent with section 2827.1 is correct or incorrect — only that the Court of Appeal erred by applying an unduly deferential standard of review to reach that conclusion.

## III.

The parties make little effort to defend the Court of Appeal's reliance on the approach described in *Greyhound*. In their briefing, the utility companies that are real parties in interest took "no position on petitioners' argument about the level of deference applicable to the Commission's interpretation of Section 2827.1." At oral argument, they argued that *Greyhound* can be understood as essentially an alternative formulation of the *Yamaha* inquiry, applicable at a certain point

on the continuum that *Yamaha* described. If *Greyhound* were best understood to mirror our later decision in *Yamaha* as applied to a particular set of circumstances, however, there would be little reason to retain *Greyhound* in place of or in addition to the more well-developed body of precedent applying the *Yamaha* inquiry. More fundamentally, regardless of whether *Greyhound* might be read in the manner the utilities suggest, it is apparent that the Court of Appeal in this case did not adopt that reading. The court understood itself to be conducting a "uniquely deferential" analysis (*Center for Biological Diversity*, *supra*, 98 Cal.App.5th at p. 31) — not applying *Yamaha*, which the Court of Appeal did not cite.

The Attorney General advances a few arguments in support of the Court of Appeal's approach, but none is persuasive. First, the Attorney General argues that some of the rationale underlying *Yamaha* has less force in the context of action by the Commission. *Yamaha* identified constitutional separation-of-powers concerns that arise when an agency, rather than a court, is effectively given final responsibility for interpreting a statute. (See *Yamaha*, *supra*, 19 Cal.4th at pp. 7, 10–11.) The Attorney General contends those concerns are not significant here, because our state's Constitution both establishes the Commission and empowers it to exercise certain "judicial functions," such as administering subpoenas, taking testimony, and punishing contempt. (Cal. Const., art. XII, § 6.)

But the very same constitutional provisions also make clear that "[t]he Legislature has plenary power . . . to establish the manner and scope of review of commission action in a court of record . . . ." (Cal. Const., art. XII, § 5; see *County of Sonoma v. State Energy Resources Conservation etc. Com.* (1985) 40

Cal.3d 361, 365–371.) Whether or not *Yamaha* should apply of its own force, our Legislature has adopted a statutory standard of review for most Commission decisions that borrows from the standard applicable to the decisions of other agencies. (§ 1757.1, subd. (b); § 1757, subd. (a)(2); see Code Civ. Proc., § 1094.5.) For the reasons discussed, that statutory standard of review is not the same as the highly deferential approach described in *Greyhound*.

Second, the Attorney General contends that the text and the legislative history of the 1998 enactment "say[] nothing about *Greyhound* or the level of deference courts should give to the Commission's interpretations of statutes." The Attorney General finds this omission noteworthy because the text of the 1998 enactment does mention an intent to expressly overrule a different decision of this court. Specifically, a portion of the 1998 enactment conveys the Legislature's intention "to, among other things, overrule" *Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Cal.3d 845, 864, which limited review of the Commission's factual findings to whether those findings have *any* evidentiary support. (Stats. 1998, ch. 886, § 1.5, subd. (b), p. 5796.)

We are unpersuaded. Although the Legislature's statement of intent could have been more explicit about the effect of its changes on the *Greyhound* decision, the statute itself could scarcely have been clearer that the "regularly pursued its authority" standard interpreted in *Greyhound* is now applicable only to decisions pertaining "solely to water corporations" (§ 1757, subd. (c); § 1757.1, subd. (b)), and not to decisions pertaining to other industries. It is hard to see how the Legislature could have intended *Greyhound*'s interpretation to

outlive the language *Greyhound* was interpreting. And although the Legislature's uncodified finding does not cite *Greyhound*, the Legislature's stated intention to make judicial review of the Commission's decisions "consistent with judicial review of the other state agencies" is best understood to include judicial review of the statutory interpretations underlying those decisions. (Stats. 1998, ch. 886, § 1.5, subd. (b), p. 5796.)[1]

Third, and finally, the Attorney General observes that this court has cited *Greyhound* even after the 1998 amendment just discussed. (See *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 796; *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1123.) Because neither of these cases arose under either the past or the current versions of sections 1757 and 1757.1, the Attorney General reads these citations as evidence that *Greyhound* does not depend on "the particular language or features of sections 1757 and 1757.1," and changes to those sections should not affect *Greyhound*'s ongoing vitality. The cases the Attorney General identifies, however, did not consider whether Senate Bill No. 779 (1997–1998 Reg. Sess.)'s changes to sections 1757 and 1757.1 bear on *Greyhound*'s continuing vitality, and thus do not shed much

---

[1] The legislative history similarly suggests that one of the "key problems involving the [Commission]" that the Legislature considered in enacting the 1998 enactment was the "widespread consensus that judicial review of [Commission] decisions is virtually nonexistent." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 779 (1997–1998 Reg. Sess.) as amended Aug. 17, 1998, p. 3.) Applying the same standard of review to Commission decisions as applies to the review of other state agency decisions is consistent with the Legislature's goal of addressing this problem.

light on the question before us. (*People v. Brooks* (2017) 3 Cal.5th 1, 110 ["a case is not authority for an issue that was not considered"].) Indeed, in one of the cases, we simply relied on the Commission's position as further support for our independent interpretation of the statute at issue; we were not asked to, and did not, directly review the validity of any Commission action. (See *T-Mobile*, at pp. 1124–1125.) Ultimately, because neither decision considered the question before us, neither constrains us here.[2]

\* \* \*

At bottom, we see no reason to conclude that a court performing the inquiry required by the amended version of section 1757, subdivision (a) or section 1757.1, subdivision (b) should employ the same inquiry prescribed under preamendment law, under which "the [C]ommission's interpretation of the Public Utilities Code" must be upheld "unless [that interpretation] fails to bear a reasonable relation to statutory purposes and language." (*Greyhound, supra*, 68 Cal.2d at pp. 410–411.) Accordingly, we conclude that the Court of Appeal erred by relying on that highly deferential approach. To the extent the following decisions also did so, we disapprove *Southern Cal. Edison Co. v. Public Utilities Com.* (2004) 117 Cal.App.4th 1039; *The Utility Reform Network v. Public Utilities Com.* (2008) 166 Cal.App.4th 522; and *Ames v. Public Utilities Com., supra*, 197 Cal.App.4th 1411.

---

[2] It is also not necessary to determine here whether *Peevey* and *T-Mobile* erred in relying on *Greyhound* in addressing matters that did not arise under the amended provisions of sections 1757 or 1757.1.

## IV.

The parties vigorously dispute whether the challenged tariff should be upheld under the *Yamaha* standard. As in *Yamaha* itself, however, we leave this question for the Court of Appeal to address in the first instance, consistent with our usual practice and with appropriate "regard for the structure of appellate decisionmaking." (*Yamaha, supra,* 19 Cal.4th at p. 15; see, e.g., *In re Cabrera* (2012) 55 Cal.4th 683, 692.)

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Center for Biological Diversity, Inc. v. Public Utilities Commission

---

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 98 Cal.App.5th 20
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S283614
**Date Filed:**  August 7, 2025

---

**Court:**
**County:**
**Judge:**

---

**Counsel:**

Shute, Mihaly & Weinberger, Ellison Folk, Aaron M. Stanton; and Malinda Dickenson for Petitioners The Protect Our Communities Foundation and Environmental Working Group.

Roger Lin, Anchun Jean Su and Howard Crystal for Petitioner Center for Biological Diversity, Inc.

Law Offices of Richard K. Bauman and Richard K. Bauman for Albion Power Company, Inc., as Amicus Curiae on behalf of Petitioners.

Environmental Law and Justice Clinic, Golden Gate University, and Caroline Farrell for Local Clean Energy Alliance, California Alliance for Community Energy, 350 Bay Area, SLO Climate Coalition, Climate Reality Project (Los Angeles Chapter), Climate Reality (San Francisco Chapter), Climate Reality (San Diego Chapter), Reclaim Our Power: Utility Justice Campaign, Project Green Home, Third Act, Sustainable

Rossmoor and the Electric Vehicle Association: Central Coast Chapter as Amici Curiae on behalf of Petitioners.

Baker Botts, Ariel D. House, Benjamin C. Hunt, Emil Barth; and Marc H. Burns for Sunnova Energy Corporation as Amicus Curiae on behalf of Petitioners.

Keyes & Fox and Julia Kantor for California Solar Energy Industries Association, Inc., as Amicus Curiae on behalf of Petitioners.

Martha Escutia, William Julian, Loretta M. Lynch and Michael Salerno as Amici Curiae on behalf of Petitioners.

Environmental Law Clinic, UC Irvine, School of Law, and Michael Robinson-Dorn for Utility Consumers' Action Network as Amicus Curiae on behalf of Petitioners.

Christine Jun Hammond, Edward Moldavsky; Rob Bonta, Attorney General, Michael J. Mongan, State Solicitor General, Samuel T. Harbourt, Deputy State Solicitor General, and Mica L. Moore, Deputy State Solicitor General, for Respondent.

Munger, Tolles & Olson, Henry Weissmann, Andra Lim, Rebecca Hansen for Real Parties in Interest Pacific Gas and Electric Company, San Diego Gas & Electric Company and Southern California Edison Company.

Ashley E. Merlo for Real Party in Interest Pacific Gas and Electric Company.

E. Gregory Barnes for Real Party in Interest San Diego Gas & Electric Company.

Rebecca Meiers-De Pastino for Real Parties in Interest Southern California Edison Company.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Malinda Dickenson
The Protect Our Communities Foundation
4452 Park Boulevard, #309
San Diego, CA 92116
(619) 693-4788

Mica L. Moore
Deputy State Solicitor General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6138

Andra Lim
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1135